UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

EDWARD KALWASINSKI,

                                   Plaintiff,

                                                          9:09-CV-0214
v.                                                        (DNH/GHL)

TERRI MAXYMILLIAN, MICHAEL HOGAN,
DONALD SAWYER,

                                   Defendants.
_____

APPEARANCES:                                   OF COUNSEL:

EDWARD KALWASINSKI, #179041
Plaintiff *pro se*
Central New York Psychiatric Center
P.O. Box 300
Marcy, New York 13403

HON. ANDREW M. CUOMO                           DEAN J. HIGGINS, ESQ.
Attorney General for the State of New York
  Counsel for Defendants
The Capitol
Albany, New York 12224

GEORGE H. LOWE, United States Magistrate Judge

## <u>REPORT-RECOMMENDATION and ORDER</u>

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has

been referred to me for Report and Recommendation by the Honorable David N. Hurd, United

States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).  Plaintiff Edward

Kalwasinski alleges that Defendants violated his right to exercise his religion at the Central New

York Psychiatric Center ("CNYPC"). Currently pending before the Court are cross-motions for

summary judgment pursuant to Federal Rule of Civil Procedure 56.  (Dkt. Nos. 33 and 37.)  For

the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part and that Plaintiff's motion be denied.

## I.    FACTUAL AND PROCEDURAL SUMMARY

On June 13, 2007, Plaintiff was civilly committed to CNYPC pursuant to Article 10 of New York's Mental Hygiene Law.  (Dkt. No. 1 at 3 ¶¶ 1-2.)  Plaintiff informed "administrators"[1] that he was a Muslim and needed to participate in all of the activities required by his faith, including prayer, meals, and ceremonies.  *Id*. at 3-4 ¶ 3.

Plaintiff alleges that Defendants Terri Maxymillian (the director of the Sex Offender Treatment Program at CNYPC), Michael Hogan (the commissioner of the New York Office of Mental Health), and Donald Sawyer (the executive director of CNYPC) violated his constitutional rights by (1) not allowing Al-Jumu'ah prayer on Fridays; (2) forcing Plaintiff to eat food from bowls and with plastic silverware contaminated with pork from prior meals eaten by non-Muslims; (3) denying Plaintiff sacred foods during holidays; (4) forcing Plaintiff to eat fish on Fridays "as the church of Catholics require[s]"; and (5) forcing Plaintiff to attend Sex Offender Treatment Program ("SOTP") classes on Fridays.  *Id*. at 4-5 ¶¶  4-7.[2]

## II.    APPLICABLE LEGAL STANDARDS

### A.    Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no

---

[1]        The complaint does not identify these "administrators" by name.

[2]        Plaintiff's motion for summary judgment focuses entirely on the Al Jumu'ah issue. (Dkt. Nos. 33-1, 33-2.)  Defendants, too, focus largely on the Al Jumu'ah issue.

genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 585-86 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). In determining whether a genuine issue of material[3] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino*, 542 F.3d 290, 309 (2d Cir. 2008).

**B.      Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Schwartz v. Compagnise Gen.*

---

[3]      A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

*Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968) (citations omitted); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged - but it has not shown - that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009). However, "the tenet that a court must accept as true all of the allegations

4

contained in the complaint is inapplicable to legal conclusions.  Threadbare recitals of the

elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*,

129 S. Ct. at 1949.

**III.     DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

      **A.     Religion Claims**

      1.     <u>Applicable Standard</u>

Depending on the circumstances, different standards apply to claims that state actors have

violated an individual's right to freely exercise religion.  Generally, in order to satisfy the Free

Exercise Clause of the First Amendment, government actions that substantially burden a

religious practice must be justified by a compelling government interest.  *Sherbert v. Verner*, 374

U.S. 398 (1963).  However, due to the unique concerns of the prison setting, prisoners' First

Amendment free exercise rights must be balanced against the interests of prison officials engaged

in the complex duties of administering the penal system.  *Ford v. McGinnis*, 352 F.3d 582, 588

(2d Cir. 2003).  Thus, a prison regulation or individualized decision to deny a prisoner the ability

to engage in a religious exercise "is judged under a reasonableness test less restrictive than that

ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's]

protected right passes constitutional muster if it is reasonably related to legitimate penological

interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of

Shabazz*, 482 U.S. 342, 349 (1987) (punctuation omitted).

The Second Circuit has not decided which standard applies to individuals, like Plaintiff,

who are civilly committed to locked psychiatric facilities that share characteristics with penal

institutions.  District courts in the Second Circuit are split on the issue.  *Compare Carney v.*

*Hogan*, No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, at *8, 2010 WL

2519121, at *3 (N.D.N.Y. Mar. 30, 2010) (applying substantial burden/compelling interest test to

CNYPC patient's free exercise claim) *and Pratt v. Hogan*, 631 F. Supp. 2d 192, 198 (N.D.N.Y.

2009) (same) (Hurd, J.), *with Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist.

LEXIS 48753, at *16-17, 2008 WL 2543573, at *6 (S.D.N.Y. June 25, 2008) (applying

legitimate penological purpose test to Mid-Hudson Psychiatric Center patient's free exercise

claim) *and Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, at *32,

2008 WL 974409, at *12 (N.D.N.Y. Apr. 8, 2008) (applying legitimate penological purpose test

to CNYPC patient's free exercise claim) (Hurd, J.).[4]  In an abundance of caution, I will consider

Plaintiff's claims in the context of each standard.[5]

Plaintiff's religious rights are also protected by the Religious Land Use and

Institutionalized Persons Act. ("RLUIPA").[6]  RLUIPA, like the Free Exercise Clause as applied

to non-prisoners, applies a compelling governmental interest test.  Specifically, RLUIPA

provides that "[n]o government shall impose a substantial burden on the religious exercise of a

---

[4]        The Court will provide Plaintiff with a copy of this unpublished decision in
accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

[5]        Defendants' position is that the legitimate penological interest test should apply
because "Plaintiff has made reference to prisoner litigation in his complaint and has not
suggested that the analysis for a free exercise claim by an involuntarily committed individual is
different from the analysis applied to prisoners' free exercise claims."  (Dkt. No. 37-8 at 3,
citation to complaint omitted.)

[6]        Although Plaintiff's complaint does not explicitly claim that Defendants are liable
under RLUIPA, I am required to construe the complaint liberally, interpreting it to raise the
strongest possible arguments that it suggests.  *Chavis v. Chappius*, 618 F.3d 162 (2d Cir. 2010).
Moreover, Plaintiff refers to RLUIPA in his motion for summary judgment.  (Dkt. No. 33-2 at 5.)
Defendants do not address RLUIPA.

person residing in or confined to an institution[7] . . . unless the government demonstrates that

imposition of the burden on that person (1) is in furtherance of a compelling governmental

interest; and (2) is the least restrictive means of furthering that compelling governmental

interest."[8]  42 U.S.C. § 2000cc-1(a).

> 2.   Al Jumu'ah Service

Plaintiff alleges that Defendants violated his religious rights by failing to hold proper Al

Jumu'ah services.  (Dkt. No. 1 at 4 ¶ 4(a).)  Defendants move for summary judgment of this

claim, arguing that the unavailability of proper Al Jumu'ah services was caused by legitimate

penological interests.  (Dkt. No. 37-8 at 5.)

> a.   *Facts*

"Al Jumu'ah is an important service for Muslims.  Unlike other Muslim daily prayers, it is

not a prayer that can be worshiped individually.  It is a congregate prayer performed every Friday

after the sun reaches its zenith and before the Asr, or afternoon prayer. . . . There is no alternative

means of attending Jumu'ah.  Attendance at the congregational prayer is obligatory on all men in

the Muslim religion."  (Najeeullah Decl., Dkt. No. 37-5 ¶¶ 10-11.)  Plaintiff alleges that CNYPC

stopped offering Al Jumu'ah services in August 2008.  (Dkt. No. 33-1 ¶ 1.)

---

[7]      An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility."  42 U.S.C. § 1997(1) (2010).

[8]      Although neither the Supreme Court nor the Second Circuit has yet decided the issue, the consensus of opinion among district courts in the Second Circuit  is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord*, 571 F. Supp. 2d 477, 506-09 (S.D.N.Y. 2008).  That issue is currently pending before the Supreme Court in *Sossamon v. Texas* (No. 08-1438, argued Nov. 2, 2010).  That issue does not affect the analysis here because Plaintiff requests both money damages and injunctive relief.  (Dkt. No. 1 at 7-9.)

At CNYPC, a Muslim prayer service or study class[9] is offered on Fridays from 9:30-10:30 a.m.  (Defs.' Ex. 1, Dkt. No. 37-4 at 2.)  Imam Malik Najeeullah presides.  (Dkt. No. 37-5 ¶ 7.) Plaintiff's official schedule at CNYPC includes this event.  (Defs.' Ex. 9, Dkt. No. 37-4 at 45.) Defendants state that "CNYPC was under the mistaken belief that the Al Jumu'ah prayer could be worshiped individually and that the regularly scheduled worship time for Muslims at 9:30 a.m. on Fridays was available to satisfy the desire of resident Muslims to worship the prayer." (Dziadyk Decl., Dkt. No. 37-6 ¶ 12.)

On January 22, 2009, Plaintiff sent a complaint to Defendant Maxymillian objecting to the lack of Al Jumu'ah services.  (Pl.'s Ex. C, Dkt. No. 33-2 at 11 ¶ 1.)  Defendant Maxymillian responded, stating that "CNYPC . . . offers Muslim prayer services on Friday mornings that are led by Imam Najeeullah.  Those services have not been changed nor has [Plaintiff] been denied the ability to attend."  (Defs.' Ex. 7, Dkt. No. 37-4 at 40.)

On February 20, 2009, Plaintiff filed this action.  (Dkt. No. 1.)

On March 18, 2009, Plaintiff sent a complaint to Defendant Sawyer in which he objected to the lack of Al Jumu'ah services.  (Pl.'s Ex. G, Dkt. No. 33-2 at 17.)  Defendant Sawyer responded that "Muslim services are offered on Fridays at 9:30 a.m.  This time was set to meet both the needs of the residents and the Imam's schedule.  The Imam has informed us that formal services do not need to happen at noon as residents can participate individually and from any

---

[9]    At various times, CNYPC officials, including Defendants, have referred to this event as a "prayer service."  (Dkt. No. 33-2 at 18; Dkt. No. 37-4 at 32, 40.)  Imam Najeeullah, who presides over the event, refers to it as a "class."  (Dkt. No. 33-2 at 16; Dkt. No. 37-5 ¶ 7.)

location at that time."[10]  *Id.* at 18.

On March 27, 2009, Imam Najeeullah issued a memorandum titled "Jumu'ah Prayer or the Friday Worship Service for Muslim[s]."  (Pl.'s Ex. A, Dkt. No. 33-2 at 7.)  It is not clear to whom the memorandum was directed, but the document states that  Elaine Dziadyk (the supervisor of rehabilitation services) and S. Montrose (a social worker supervisor) received copies.  *Id.*  Imam Najeeullah explained that Al Jumu'ah should occur at approximately 1:15 p.m. during daylight savings time, that the prayer was "obligatory for all Muslims," and that the Friday morning Muslim study class at CNYPC was "not a Jumu'ah worship service."  *Id.*  Imam Najeeullah stated that his schedule did not allow him to facilitate a Friday Al Jumu'ah prayer service at CNYPC, but that "[t]here should always be a qualified Imam available to facilitate this service if it is allowed."  *Id.*

On May 1, 2009, John Culkin, the Director of the Bureau of Sex Offender Evaluation and Treatment, responded to an April 7, 2009, letter from Plaintiff.  (Pl.'s Ex. D, Dkt. No. 33-2 at 15; Defs.' Ex. 8, Dkt. No. 37-4 at 42.)  Mr. Culkin stated that "[p]er staff at Central New York Psychiatric Center, the facility offers Muslim prayer services at 9:30 am on Friday mornings. These services have not changed nor have you been denied the right to attend them as currently scheduled.  The Imam has additionally informed [CNYPC] staff that formal services do not need to occur at noon as residents can participate individually and from any location at that time."  *Id.*

On May 19, 2009, Mental Hygiene Legal Services wrote to Mr. Culkin, enclosing a copy

---

[10]     In response to interrogatories, Defendant Sawyer identified "the Imam" who had "informed" him on these matters as Imam Abdullah Muhammad.  (Pl.'s Ex. G, Dkt. no. 33-2 at 19.)  Imam Abdullah Mohammad is the Muslim Chaplain at Mohawk Correctional Facility. (Pl.'s Ex. B, Dkt. No. 33-2 at 8.)

of a letter from Imam Najeeullah.  (Pl.'s Ex. E, Dkt. No. 33-2 at 16.)  Mental Hygiene Legal Services noted that Imam Najeeullah's letter stated  "that the Jumu'ah worship service is 'obligatory for all Muslims,' just as 'Sunday worship service is for all Christians'" and that "the 'study classes' he does host on Thursdays and Fridays are 'not a Jumu'ah worship service.'"  *Id*.

On October 23, 2009, Defendants Sawyer and Maxymillian responded to Plaintiff's interrogatories.  (Dkt. No. 37-4 at 52-66.)  In those responses, Defendants reiterated their answers to Plaintiff's grievances and stated that Imam Abdullah Muhammad had informed them that congregate prayer was not necessary for Al Jumu'ah.  *Id*.

On January 13, 2010, Imam Abdullah Muhammad wrote to Deputy Attorney General Dean J. Higgins, counsel for Defendants in this action.  (Pl.'s Ex. B, Dkt. No. 33-2 at 8.)  He stated that he was writing to "clarify a gross misunderstanding" that Al Jumu'ah "can be performed individually." *Id*.  He explained that "[a]ttendance at the congregational prayer is obligatory on all men . . . So, it is impossible for me to advise anyone that Jumu'ah prayer can be performed individually.  What I did say, and it may be the source of the misunderstanding, is that the [five] daily prayers can be performed individually under circumstances such as those found in jails, prisons, and other institutions." *Id*.

At some point, officials at CNYPC came to understand that "Al Jumu'ah is a congregate prayer that can[]not be worshiped individually. "  (Dziadyk Decl., Dkt. No. 37-6  ¶¶ 13.) Thereafter, the facility "commenced a search for a Muslim Imam to conduct the service." *Id*. ¶ 14.  CNYPC officials asked Imam Najeeullah to preside at the service.  *Id.* ¶ 15.  Imam Najeeullah is employed part-time by both the New York Department of Correctional Services ("DOCS") at Marcy Correctional Facility and the Department of Mental Health at CNYPC.

(Najeeullah Decl., Dkt. No. 37-5  ¶¶ 2-3.)  Imam Najeeullah attempted to get permission from DOCS to conduct a service at CNYPC, but his request was denied because it would conflict with his schedule of services at Marcy.  *Id.* ¶ 12.

Imam Najeeullah has worked with CNYPC officials "to identify an eligible Imam who would be able to conduct services at the Center," but no such individual has been found.  (Dkt. No. 37-5 ¶ 13.)  At one point, an individual was "identified . . . , but it was determined that he was not eligible" because of "issues in his background." *Id.* ¶ 14; Dkt. No. 37-6 ¶ 18. Defendants do not identify what these "issues" were or why they rendered the individual unsuitable.  Defendants state that the search is ongoing.  (Dkt. No. 37-5 ¶ 16; Dkt. No. 37-6 ¶ 19.)

On February 4, 2010, Stephen C. Clark, the principal attorney for the Mental Hygiene Legal Service for the Fourth Judicial Department, wrote to Plaintiff.  (Pl.'s Ex. C, Dkt. No. 33-2 at 9-10.)  Mr. Clark reported that he had met with members of the CNYPC staff, including Defendants Sawyer and Maxymillian, to discuss the lack of Al Jumu'ah services at CNYPC.  *Id.* at 9.  Defendant Sawyer stated that CNYPC was "actively attempting" to find someone and "insured that he would continue to work to bring this matter to a quick resolution." *Id.*  Mr. Clark inquired whether Plaintiff would be interested in being trained to lead Al Jumu'ah services because Defendant Sawyer "seemed to indicate that the hospital would be willing to entertain getting appropriate training for someone currently there [] to run such services." *Id.*

b.      *Analysis*

Under the legitimate penological interest test, a prisoner "must show at the threshold that

11

the disputed conduct substantially burdens[11] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591).  Defendants do not dispute that Plaintiff's religious beliefs are sincerely held or that the lack of Al Jumu'ah services burdened those beliefs. Indeed, for the purposes of the pending motions, Defendants concede that Al Jumu'ah "is a central religious service of the Muslim faith" and that "[t]here is no alternative to the Al Jumu'ah worship."  (Dkt. No. 37-8 at 5.)  Therefore, I find that Plaintiff holds a sincere religious belief that has been substantially burdened.  The issue, then, is whether Defendants have established as a matter of law that this burden was caused by a legitimate or compelling governmental interest.

Under the deferential legitimate penological interest test, once a plaintiff establishes that his or her sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted).  Although the defendants' burden is "relatively limited," the legitimate penological interest advanced must have been the *actual* reason for the defendants' actions.

---

[11]          Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test.  "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied.  Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008)(citations and some punctuation omitted).

"Post hoc justifications with no record support will not suffice."  *Salahuddin*, 467 F.3d at 276-77.

Here, Defendants rely on a post hoc justification.  Defendants state that they

> are not opposed to permitting Plaintiff's participation in the congregate Al Jumu'ah; however . . . there is currently no Imam available to conduct the service . . . [T]he Imam and the CNYPC staff are addressing this issue and have instituted a search for a person to conduct the service.  Once an Imam is identified, the service will be instituted and Plaintiff will be permitted to attend.

(Dkt. No. 37-8 at 5.)  This was not the reason that Defendants initially gave for not offering the Al Jumu'ah service.  Rather, Defendants initially responded to Plaintiff's complaints by stating that they believed that the Friday morning session offered by Imam Najeeullah was sufficient and that no congregate Al Jumu'ah service was required.[12]  Defendants admit in their motion papers that this belief was "mistaken."  (Dkt. No. 37-6 ¶ 12.)  Defendants persisted in this "mistaken belief" for at least seventeen months, from the time that they ceased offering Al Jumu'ah services in approximately August 2008 until January 2010, when  Imam Muhammad wrote to defense counsel to correct Defendants' "gross misunderstanding."  (Dkt. No. 37-4 at 40; Dkt. No. 33-2 at 8.)  Indeed, individuals associated with CNYPC continued to assert their belief that Al Jumu'ah was not required for several months after Plaintiff filed this action.  (Dkt. No. 37-4 at 42.)  Thus, the initial denial of Al Jumu'ah was due not to the lack of an Imam as Defendants now contend, but rather to a misunderstanding of the religious significance of Al Jumu'ah.  It was not until after Imam Muhammad corrected this misunderstanding that Defendants began to search for an Imam

---

[12]       I note that such a justification would not, if asserted in the pending motion, be legally sufficient to entitle Defendants to summary judgment.  *Ford*, 352 F.3d at 597-98.  Even if this justification were legally sufficient, it would not be factually supported here.  As Imam Muhammad indicated in his letter to defense counsel, he never intended for Defendants to believe that congregate Al Jumu'ah prayer is merely optional for Muslims.

who could preside at Al Jumu'ah.

Even if Defendants' justification were not post hoc, it would be insufficient to support a finding, as a matter of law, that the denial of Al Jumu'ah was motivated by a legitimate penological interest.  As another judge in this District has observed, the legitimate penological interest inquiry "is particularly fact-lad[]en and often ill-suited for resolution on [a] motion for summary judgment . . ." *Jackson v. Boucaud*, No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, at *26, 2009 WL 6066799, at *7 (N.D.N.Y. Dec. 31, 2009).[13]   Here, Defendants simply have not provided the Court with enough information to analyze the issue.  Defendants do not provide any details at all about why the search for an Imam has been unsuccessful, other than to state that one potential Imam was not eligible because of unspecified "issues in his background."  (Dkt. No. 37-6 ¶ 18.)

Defendants' justification, and the lack of detail they provide about it, is similar to that asserted in a recent case from the District of Connecticut.  *Vega v. Lantz*, No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D. Con. Sept. 25, 2009).[14]  In *Vega*, a state prisoner claimed that his free exercise and RLUIPA rights were violated because the facility routinely cancelled Al Jumu'ah.  *Vega*, 2009 WL 315786, at *1.  The defendants conceded that Al Jumu'ah had been frequently cancelled over a four-year period, but argued that cancellation was necessary "when there is no chaplain available or in case of a security lockdown."  *Id.* at

---

[13]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

[14]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

*11.  The court denied the defendants' motion for summary judgment because the defendants "provide[d] no explanation for the frequent cancellation of Jumah, or of the insufficient and unequal staffing that allegedly underlies it."  *Id*.  Thus, the court found, the defendants had failed "to carry their burden of showing that the frequent cancellation of Jumah is either rationally related to a legitimate penological interest . . . or in furtherance of a compelling governmental interest."  *Id*.

Therefore, I recommend that the Court deny Defendants' motion for summary judgment dismissing Plaintiff's claim regarding the Al Jumu'ah service.

### 3.   Bowls and Utensils

Plaintiff alleges that Defendants violated his religious rights by "forcing Plaintiff to eat food from bowls contaminated with pork from prior meals eat[en] by non-Muslims."  (Dkt. No. 1 at 4 ¶ 4(b).)  Defendants move for summary judgment dismissing this claim, arguing that Plaintiff's religious beliefs have not been burdened.  (Dkt. No. 37-8 at 6.)  Defendants are correct.

Imam Najeeullah declares that there is "no prohibition" on eating from a bowl or using a utensil previously used by a non-Muslim to eat pork "so long as they have been washed and sanitized . . ."  (Dkt. No. 37-5 ¶¶ 18-19.)  Valerie Fasteson, the Director of Nutritional Services for CNYPC, declares that plates, bowls, and utensils are "thoroughly washed and sanitized" before they are reused.  (Dkt. No. 37-7 ¶ 6.)  CNYPC residents can also request disposable plates and tableware that would be used only once and then discarded.  *Id*. ¶ 7.  Plaintiff has not made such a request.  *Id*.

In opposition to Defendants' motion for summary judgment, Plaintiff admits that "all bowls and utensils are washed and sanitized after use and before re-use and such washing is

consistent with the tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 20; Dkt. No. 40 ¶ 9.)

Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs have been burdened and I recommend that the Court dismiss Plaintiff's claim regarding the contamination of bowls and utensils.

4.      Food Issues

Plaintiff alleges that his religion requires him to eat Halal foods and that Defendants violated his constitutional rights by forcing him "to eat meals issued for Christian and Catholic religions, e.g.: Friday Muslims must eat fish as the church of Catholics require." (Dkt. No. 1 at 5 ¶ 5.) It is not entirely clear whether Plaintiff objects to the lack of a Halal menu or to the fact that fish is served on Fridays. Defendants argue that serving fish on Fridays does not burden Plaintiff's religious beliefs and that they are not constitutionally required to provide an entirely Halal menu. (Dkt. No. 37-8 at 5-6.)

a.      *Fish on Friday*

Imam Najeeullah declares that "[f]ish is an acceptable food for a Muslim diet and the service of fish would violate no tenet of our faith." (Dkt. No. 37-5 ¶ 21.) Plaintiff admits in his reply papers that fish is a permissible food under Islamic law. (Dkt. No. 40 ¶ 8.) Therefore, Plaintiff has not raised a triable issue of fact that his sincerely held religious beliefs were burdened by the fact that fish was served on Fridays at CNYPC and I recommend that the Court grant Defendants' motion for summary judgment with respect to the claim that CNYPC's practice of serving fish on Fridays violated Plaintiff's rights under the Free Exercise Clause or RLUIPA.[15]

---

[15]      Plaintiff may also be asserting an Establishment Clause claim regarding the service of fish on Fridays. Any such claim would be subject to dismissal for failure to state a claim. *See Travillion v. Leon*, 248 Fed. App'x 353, 355-56 (3d Cir. 2007) (affirming trial court's

b.     *Halal Foods*

Plaintiff may also be claiming that Defendants violated his free exercise and RLUIPA rights because CNYPC does not offer a Halal menu.  (Dkt. No. 1 at 5 ¶ 5.)  Defendants move for summary judgment of this claim.  (Dkt. No. 37-8 at 5-6.)

The Second Circuit has "clearly established that a prisoner has a right to a diet consistent with his or her religious scruples."  *Ford*, 352 F.3d at 597.  However, "[a]ll that is required for a prison diet not to burden an inmate's free exercise of religion is the provision of a diet sufficient to sustain the prisoner's good health without violating [his religion's] dietary laws."  *Muhammad v. Warithu-Deen Umar*, 98 F. Supp. 2d 337, 344 (W.D.N.Y. 2000) (citing *Abdul-Malik v. Goord*, No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402, at *6 (S.D.N.Y. Feb. 27, 1997)).[16]

Defendants assert that meals at CNYPC "do not violate any tenets of the Muslim faith." (Dkt. No. 37-1 ¶ 19.)  For this proposition, Defendants cite the declarations of Valerie Fasteson and Imam Najeeullah.  *Id*.  Neither of the declarations cited by Defendants show that CNYPC meals do not violate Muslim dietary laws.  Ms. Fasteson declares that "[a]lthough the dietary service does not serve a strictly Halal diet, we do serve meals that are not violative of Muslim tenets.  We do serve an alternative diet that, upon information and belief and based on the declaration of Imam Najeeullah . . . , does accommodate the Muslim faith.  This would include

---

12(b)(6) dismissal of claim that jail's service of vegetarian menu during Lent violated Protestant inmate's rights under the Establishment Clause).

[16]     The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

an option that would insure a pork free diet." (Dkt. No. 37-7 ¶ 5.)  Imam Najeeullah's declaration does not state that CNYPC's alternative diet accommodates the Muslim faith.  Rather, Imam Najeeullah merely states that fish in an acceptable food for a Muslim diet and that "the Halal diet is important to a Muslim's faith . . . I will work with CNYPC staff to try and find ways to make a Halal diet possible." (Dkt. No. 37-5 ¶¶ 21-22.)  These vague declarations stand in stark contrast to the evidence presented in a case cited by Defendants, *Majid v. Fischer*, No. 07 Civ. 4584, 2009 U.S. Dist. LEXIS 71616 (S.D.N.Y. Jul. 31, 2009).[17]  There, the defendants provided the court with a report from an Imam explicitly stating that the pork-free menu offered by DOCS was "adequate and sufficient for Muslims under Islamic law and does not require Muslims to choose between violating their religious practice or starving." *Majid*, Dkt. No. 37-10 at 8.

Moreover, Defendants have not provided the Court with enough evidence to establish as a matter of law that CNYPC provides a pork-free diet that is sufficient to sustain Plaintiff's good health.  Indeed, the only reference in the record to the nutritional quality of the alternative menu is one sentence in the Inpatient Operations Manual stating that CNYPC's pork-free diet "meets 100 percent of the RDA." (Defs.' Ex. 3, Dkt. No. 37-4 at 24.)  Defendants do not note this fact in their memorandum of law or ask the Court to draw any conclusions from it.

Additionally, Defendants have not provided any evidence regarding the legitimate penological or compelling interests supporting the menu at CNYPC.  Although Defendants cite cases upholding DOCS' menu in the face of First Amendment and RLUIPA challenges by Muslim inmates, Defendants have not provided the Court with any evidence that CNYPC's menu

---

[17]      Defendants served a copy of this unpublished decision on Plaintiff with their summary judgment papers.  (Dkt. No. 37-10.)

is similar to DOCS' or that it is driven by similar penological interests.  In contrast to the dearth

of detail here, the defendants in *Majid* provided the court with a declaration describing in detail

the number of inmates who needed to be fed in the DOCS system, the nutritional and religious

factors that DOCS considered in formulating menus, the cost of providing a pork-free (but non-

Halal) menu as compared with the regular menu, and the problems associated with obtaining

Halal meats.  Thus, I find that Defendants have not established, as a matter of law, that CNYPC

provided Plaintiff with a diet sufficient to maintain his good health without violating Muslim

dietary laws.  Therefore, I recommend that the Court deny Defendants' motion for summary

judgment dismissing this claim.

> 5.    Classes on Fridays and Denial of Sacred Foods on Holidays

Defendant's motion for summary judgment does not address Plaintiff's claims that (1)

being required to attend classes on Fridays violates his religious rights; or (2) Defendants

violated Plaintiff's religious rights by denying him sacred foods on holidays.  Therefore, I find

that the claims should survive Defendants' motion for summary judgment.

> **B.    DUE PROCESS CLAIM**

Plaintiff claims that Defendants violated his Fifth and Fourteenth Amendment rights to

due process.  (Dkt. No. 1 at 7.)  Regarding the due process issue, Plaintiff's complaint states only

that "Plaintiff has not d[one] anything to lose his right[s] afforded by the" First Amendment.  *Id.*

Defendants argue that the complaint fails to state a due process claim.  (Dkt. No. 37-8 at 6-7.)

Defendants are correct.  Plaintiff's due process claim simply duplicates his free exercise and

RLUIPA claims.  *See Velez v. Levy*, 401 F.3d 75, 94 (2d Cir.2005) ("[W]here a specific

constitutional provision prohibits government action, plaintiffs seeking redress for that prohibited

19

conduct in a § 1983 suit cannot make reference to the broad notion of substantive due process."). Therefore, I recommend that the Court grant Defendants' motion for summary judgment dismissing Plaintiff's due process claim.

### C.  EIGHTH AMENDMENT CLAIM

Plaintiff claims that Defendants violated his Eighth Amendment rights.  (Dkt. No. 1 at 8.) Defendants argue that the complaint fails to state an Eighth Amendment claim.  (Dkt. No. 37-8 at 6-7.)  Defendants are correct.

The Eighth Amendment to the United States Constitution prohibits "cruel and unusual" punishments.  The word "punishment" refers not only to deprivations imposed as a sanction for criminal wrongdoing, but also to deprivations suffered during imprisonment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  Punishment is "cruel and unusual" if it involves the unnecessary and wanton infliction of pain or if it is incompatible with "the evolving standards of decency that mark the progress of a maturing society."  *Estelle*, 429 U.S. at 102.  To satisfy the objective component of an Eighth Amendment claim,  a prisoner must show that the defendant's "act or omission ... result[ed] in the denial of the minimal civilized measure of life's necessities."  *Farmer*, 511 U.S. at 834.  Therefore, "extreme deprivations are required to make out a conditions-of-confinement claim."  *Hudson v. McMillian*, 503 U.S. 1, 9 (1992).  To satisfy the subjective component, the defendant's behavior must be "wanton."  *Whitley v. Albers*, 475 U.S. 312, 320 (1986).  Where a prisoner claims that a defendant provided inadequate conditions of confinement, he must show that the defendant acted with "deliberate indifference."  *Wilson v. Seiter*, 501 U.S. 294, 302-03 (1991).  A prison official demonstrates deliberate indifference to inhumane conditions of confinement where he "knows of and disregards an excessive risk to

inmate health or safety; the official must both be aware of facts from which the inference could

be drawn that a substantial risk of serious harm exists, and he must also draw the inference."

*Farmer*, 511 U.S. at 837.

Here, Plaintiff has not raised a triable issue of fact that Defendants deprived him of the

minimal civilized measure of life's necessities or that they knew of and disregarded an excessive

risk to Plaintiff's health or safety.  Therefore, I recommend that the Court grant Defendants'

motion for summary judgment of Plaintiff's Eighth Amendment claim.

### D.      PERSONAL INVOLVEMENT BY DEFENDANT HOGAN

Defendants argue that any claims against Defendant Hogan should be dismissed because

Plaintiff has failed to allege that Defendant Hogan was personally involved in any constitutional

violation.  (Dkt. No. 37-8 at 7-8.)  Defendants are correct.

Under Second Circuit precedent, "'personal involvement of defendants in alleged

constitutional deprivations is a prerequisite to an award of damages under § 1983.'"  *Wright v.

Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885

(2d Cir. 1991)).  In order to prevail on a *Bivens* cause of action against an individual, a plaintiff

must show some tangible connection between the unlawful conduct and the defendant.  *Bass v.

Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).  If the defendant is a supervisory official, a mere

"linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the

doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that

unlawful conduct.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347

F.3d 431, 435 (2d Cir. 2003); *Wright*, 21 F.3d at 501; *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d

Cir. 1985).  In other words, supervisory officials may not be held liable merely because they held

a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[18] *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Here, the complaint does not mention Defendant Hogan at all other than in the caption and the list of parties. (Dkt. No. 1.) In response to interrogatories from Plaintiff, Defendant Sawyer stated that he could not recall Defendant Hogan making any inquiry about Plaintiff's March 18 complaint. (Dkt. No. 33-2 at 19.) Thus, the complaint fails to plausibly suggest, and the evidence fails to raise a triable issue, that Defendant Hogan was personally involved in any alleged constitutional violation. Therefore, I recommend that the Court dismiss Plaintiff's claims against Defendant Hogan.

## IV.    PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff's motion for summary judgment (Dkt. No. 33) focuses entirely on the lack of Al Jumu'ah services at CNYPC. I have discussed all of the evidence submitted by Plaintiff

---

[18]    In *Iqbal*, 129 S.Ct. at 1949, the Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's own purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States*, 674 F. Supp. 2d 531, 543-44 (S.D.N.Y. 2009) (collecting cases). I will assume for the purposes of this motion that the *Colon* categories remain good law.

regarding this issue above, in Section III(A)(2).  In analyzing Plaintiff's motion for summary

judgment, I must resolve all ambiguities and draw all reasonable inferences in Defendants' favor.

*Major League Baseball Props., Inc.*, 542 F.3d at 309.  Although, as discussed above, Defendants

have not provided the Court with sufficient evidence to support summary judgment in their favor

on the Al Jumu'ah issue, they have provided sufficient evidence to raise a triable issue of fact.  A

reasonable juror could find that Defendants had a legitimate penological or a compelling interest

for the decision not to hold Al Jumu'ah services at the proper time.  Therefore, I recommend that

the Court deny Plaintiff's motion for summary judgment.

  **ACCORDINGLY**, it is

  **RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 37) be

**GRANTED IN PART AND DENIED IN PART**.  I recommend that the Court grant

Defendants' motion and dismiss the following claims: (1) the free exercise and RLUIPA claims

regarding the use of bowls and utensils; (2) the free exercise and RLUIPA claims regarding

CNYPC's practice of serving fish on Fridays; (3) any Establishment Clause claim regarding

CNYPC's practice of serving fish on Fridays; (4) the due process claim; (5) the Eighth

Amendment claim; and (6) all claims against Defendant Hogan; and it is further

  **RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be

**DENIED**; and it is further

  **RECOMMENDED** that the following claims survive the pending motions: (1) the free

exercise and RLUIPA claims regarding the lack of Al Jumu'ah services at CNYPC; (2) the free

exercise and RLUIPA claims regarding the lack of a Halal menu at CNYPC; (3) the claim

regarding CNYPC's requirement that Plaintiff attend classes on Fridays; and (4) the claim that

Defendants denied Plaintiff sacred foods on holidays.  The parties should be prepared, in further proceedings, to fully brief whether the legitimate Penological interest or the compelling government interest test should be applied to this case; and it is further

**ORDERED** that the Clerk provide Plaintiff with copies of *Carney v. Hogan*, No. 9:08-CV-1251 (DNH/ATB), 2010 U.S. Dist. LEXIS 59439, 2010 WL 2519121 (N.D.N.Y. Mar. 30, 2010); *Lombardo v. Holanchock,* No. 07 Civ. 8674, 2008 U.S. Dist. LEXIS 48753, 2008 WL 2543573 (S.D.N.Y. June 25, 2008); *Abdul-Matiyn v. Pataki*, No. 9:06-CV-1503, 2008 U.S. Dist. LEXIS 118430, 2008 WL 974409 (N.D.N.Y. Apr. 8, 2008); *Jackson v. Boucaud*, No. 9:08-CV-1373 (TJM/DEP), 2009 U.S. Dist. LEXIS 125893, 2009 WL 6066799 (N.D.N.Y. Dec. 31, 2009); *Vega v. Lantz*, No. 304CV1215DFM, 2009 U.S. Dist. LEXIS 88550, 2009 WL 3157586 (D. Con. Sept. 25, 2009); and *Abdul-Malik v. Goord*, No. 07 Civ. 4584, 1997 U.S. Dist. LEXIS 2047, 1997 WL 83402 (S.D.N.Y. Feb. 27, 1997) in accordance with the Second Circuit's decision in *LeBron v. Sanders*, 557 F.3d 76 (2d Cir. 2009).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

Dated: December 22, 2010

Syracuse, New York

George H. Lowe
United States Magistrate Judge

24